# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
February 13, 2013 Session

## STATE OF TENNESSEE v. FRANSCISCO I. BUSTAMONTE AND SCOTT CARROLL, JR.

### Appeal from the Criminal Court for Dekalb County
No. 2011CR48     David A. Patterson, Judge

### No. M2012-00102-CCA-R3-CD - Filed May 7, 2013

This case is the consolidated appeal of two defendants, Franscisco I. Bustamonte and Scott Carroll, Jr., who were convicted for the initiation of a process intended to result in methamphetamine, a Class B felony.[1]  The trial court sentenced Defendant Carroll as a Career Offender to thirty years in the Tennessee Department of Correction.  The trial court sentenced Defendant Bustamonte as a Range I, standard offender to eleven years in the Tennessee Department of Correction.  On appeal, Defendant Carroll contends that the trial court erred when it denied his motion to suppress evidence found during the search of the residence.  Additionally, both Defendants assert that: (1) the trial court erred when it allowed the State to amend the indictment to change the date of the offense; (2) the evidence is insufficient to sustain the conviction; (3) the trial court erred when it failed to instruct the jury on the charges of manufacture of methamphetamine, promotion of methamphetamine, and unlawful drug paraphernalia; (4) the trial court erred when it admitted into evidence the State's inventory list of the ingredients found during a search of the residence and photographs taken during the search; and (5) the trial court erred when it sentenced them.  After a thorough review of the record and applicable authorities, we conclude there exists no error in the judgments of the trial court.  We, therefore, affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JEFFREY S. BIVINS, JJ., joined.

James M. Judkins, Smithville, Tennessee, for the appellant Francisco I. Bustamonte.

---

[1] Both Defendants were also convicted of reckless endangerment.  After the hearing on the Defendants' motions for new trial, the trial court granted a new trial on that offense.

David N. Brady and Allison Rasbury West, Cookeville, Tennessee, for the appellant, Scott Carroll, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randy York, District Attorney General; and Greg Strong and Gary McKenzie, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from law enforcement officials responding to a report of a methamphetamine ("meth") laboratory at a home located on Loop Circle in DeKalb County, Tennessee. After an investigation, officers arrested Defendant Bustamonte, Defendant Carroll, and Wesley Hayes. A DeKalb County grand jury indicted the three men for initiation of a process intended to result in methamphetamine and reckless endangerment.

### A. Motion to Suppress

Before trial, Defendant Carroll filed a motion to suppress the evidence found during the search of a residence wherein items associated with the manufacture of methamphetamine were found. The State countered that Defendant Carroll had no Fourth Amendment protections because he did not have a claim to that residence. At the motion hearing, the parties presented the following evidence: Bridgette Diane Carroll, Defendant Carroll's wife, testified that on January 25, 2011, she was living at 200 Loop Circle. The Defendant would "come and go as he pleased," but he would not stay at the house if Carroll was not there. She said that the Defendant came to the home when Carroll was there, and he left when she went to sleep at night. Carroll testified that she considered the Defendant a "guest" in her home.

Ray Junior Wilkey testified that, in January 2011, he lived at 200 Loop Circle with his two daughters, Bridgett Carroll and Kelly Wilkey. He said that his mother leased the property in February 2010, and the lease was set to expire in February 2011. Wilkey's mother spoke to the landlord, who agreed to allow Wilkey to take over the lease beginning in February 2011. At the time of this search, January 2011, Wilkey had not yet signed the new lease.

Wilkey testified that the Defendant did not live at the residence with them, but he "stayed [there] ever[y] now and then." Wilkey said that Wilkey's mother had told the Defendant she did not want him staying at the house, but he still sometimes came in at night

when everyone was asleep. Wilkey said the Defendant did not have permission to stay at the home.

Wilkey testified that, on January 23, 2011, he returned home from work and went to Carroll's room to speak with her. She was asleep when he entered and the Defendant was not present. Wilkey noticed a strong smell of ammonia emanating from the room. The following day, Wilkey discussed this with his sister, who recommended that he speak with Sheriff's deputies about the possibility that the Defendant was cooking methamphetamine in the residence. Wilkey said he did so, and the Sheriff's deputies indicated they would come to his home and investigate. Later that day, January 25, 2011, the Sheriff's Deputies arrived at his house and asked permission to search the residence. Wilkey granted permission for the search, and pointed out the house in which he resided.

During cross-examination, Wilkey testified that he was not listed on the lease on the day the search was executed. He conceded that, on occasion, the Defendant ate dinner in the home. He agreed that his mother, whose name was on the lease at the time of the search, had not granted consent for the search.

On redirect examination, Wilkey said that the Defendant did not keep any of his personal items at the house.

Jeremy Taylor, a detective with the DeKalb County Sheriff's Department, testified that his responsibilities included investigating drug cases. He said he searched the residence at 200 Loop Circle with Wilkey's consent. Detective[2] Taylor described the layout of the home and said that, when he entered the home, Wilkey pointed out to him in which room the Defendant was located. Detective Taylor knocked on the door, and the Defendant answered. The detective said he identified himself and asked the Defendant if he could enter the room. The Defendant stepped back from the door and indicated with his hands that the detective could enter.

Detective Taylor said that, after he entered the room, the Defendant indicated that the contents therein belonged to him. There were two other people in the room, both of whom the detective had to ask to "turn the burners off."

During cross-examination, Detective Taylor testified that the Defendant never granted him permission to enter the front door of the home and never gave him written consent to

---

[2] At the time of this incident, Detective Taylor held the rank of deputy. At the time of the hearing, however, he had been promoted to detective. We will refer to him by his acquired rank of detective.

search. Instead, Wilkey gave him written permission to enter the front door of the home, and the Defendant orally gave him permission to enter his room.

The State recalled Wilkey, who testified that the Defendant had asked him to tell the trial court that Wilkey's name was not on the lease. On redirect examination, Wilkey testified that the Defendant did not ask him to lie but simply asked him to state that fact to the trial court.

The State recalled Bridgett Carroll, who testified that her grandmother was the person who was the signator of the lease at the time that the search was executed. Her father, Wilkey, was set to sign a new lease on the property on February 3, a week after the search. Her grandmother told her that, as part of Wilkey taking over the lease, the landlord would require Carroll to pay a portion of the deposit.

Carroll testified that the Defendant Carroll had, around the time of his arrest, a MERSA staff infection, and he kept at the home some of the medical supplies necessary to cover his infection.

Based upon this evidence, the trial court denied Defendant Carroll's motion to suppress, finding that consent may properly be given by a person living in the home and that consent was given by Wilkey. The trial court further found that Defendant Carroll did not have a possessory interest in the home and that Defendant Carroll had allowed officers to enter into the room where he was at the time of the search.

## B. Trial

At the Defendants' trial, the parties presented the following evidence: Detective Taylor testified in accordance with the testimony he offered at the suppression hearing. He added that the residence located at 200 Loop Circle was a brick house with a carport. There were five people present at the house when he arrived: Defendant Carroll, Defendant Bustamonte, another defendant, Defendant Carroll's wife, and Defendant Carroll's sister-in-law, Kelly Wilkey, who was sixteen years old at the time.

Detective Taylor said that, after he arrived at the house, he spoke with Ray Wilkey, who had called the Sheriff's Department to report that Defendant Carroll was manufacturing methamphetamine in the home. Wilkey informed the detective that he rented the residence, and he gave the officer consent to search the home. Wilkey told detectives in which room Defendant Carroll was located, and the detective knocked on the door to that room. Defendant Carroll answered the door wearing gloves, and backed up and put his hands on his head, seeming to indicate that the detective could come into the room. Detective Taylor

noted that there were two other men, one of whom was Defendant Bustamonte, standing beside a bathroom door, and both of those men were also wearing gloves.[3] The bathroom door, the detective estimated, was three feet from the bedroom door. Defendant Carroll told the detective, "It's all mine."

Detective Taylor testified that the bathroom and the bedroom had a "chemical smell" similar to the smell he had noted at other meth labs. The detective saw two "cookers" in the bathroom that were both still burning. He directed Defendant Bustamonte to turn off the burners, and Defendant Bustamonte complied. The detective said he noted that upon each burner was located a bowl that contained a clear liquid. The detective testified that, in the bathroom beside the sink, he also found a twenty-ounce soda bottle with a hole drilled in the top and rubber tubing coming out, which was wrapped in black tape. This type of device, he said, was commonly used for "gas[s]ing off" methamphetamine, turning the methamphetamine from a liquid to a solid.

The detective testified that the only entrance and exit to the bathroom was from the bedroom, and that the Defendants were standing beside the bathroom door, with the bathroom door open.

Detective Taylor testified that, at this point, he read the Defendants their *Miranda* rights, and then asked them some questions. He asked Defendant Carroll what he meant when he said "It's all mine," and Defendant Carroll pointed the detective toward two bags. The two bags, located approximately six feet from the bathroom, contained more components required for the manufacture of meth. Detective Taylor said he made an inventory of the items he found in the bag, and the trial court admitted that inventory list into evidence, over the Defendants' objections. The detective took the two bags outside and took photographs of the bags and their contents, and the photographs were shown to the jury. The detective described the items that were depicted in the pictures of the bags. Detective Taylor testified that all the items contained in the bags were consistent with the manufacture of methamphetamine.

Detective Taylor testified as to the gloves worn by Defendant Bustamonte and Defendant Carroll when he entered the room. He said that, in his experience, those manufacturing meth often wear gloves to protect their hands from getting poked or burned. The detective said that the materials present in the room were ones that would be mixed to make methamphetamine, and he could not think of any other reason for those items to be

---

[3] In later testimony, Detective Taylor was asked who was wearing gloves, and he responded "the two defendants" referring to Defendant Carroll and Defendant Bustamonte. It is unclear, therefore, whether the third man was wearing gloves.

grouped together. He further opined that the men were in the "final stages" of manufacturing meth, which he called the "panning" stage.

During cross-examination, Detective Taylor agreed that some of the items he found in the bags in the room with the Defendants had uses other than for producing methamphetamine. He noted that the drain cleaner, turkey baster, and pyrex dishes were not illegal items. Detective Taylor said that he did not send the liquid from the dishes on the burners to the Tennessee Bureau of Investigations ("TBI") laboratory because the substance was hot and could not be transported safely. The detective testified that he did not find any aphedrine or sudaphedrine packs. Detective Taylor testified that Defendant Bustamonte did not make any statement to him.

Caleb Meadows, an officer with the Dekalb County Sheriff's Department, testified that he responded to the scene involved in this case. He said, upon arriving, he noted a "very strong chemical smell" coming from the house, even before he opened the door. Officer Meadows described the bedroom wherein the Defendants were found, and his description comported with that of Detective Taylor's testimony. Officer Meadows said that, in the bedroom, they found Defendant Carroll, Defendant Bustamonte, and Wesley Hayes, all of whom were wearing black and tan gloves. Officer Meadows said that Defendant Carroll made the statement, "It's all mine," and would not allow the two other individuals to speak.

During cross-examination, Officer Meadows testified that he did not create a police report for this incident. He was, therefore, relying upon his memory for his testimony. Officer Meadows testified that he was later told that there was a door inside the bedroom that led to another room, but he did not independently verify this fact.

Patrick Ray, the Dekalb County Sheriff, testified about the training he had received in the detection and dismantling of meth labs. He said he had investigated over 100 meth labs during his career, and he noted that there are multiple ways to construct a meth lab. He said, in his jurisdiction, the "smaller meth lab[s]" were more prevalent, and the items necessary to make the lab could fit into a backpack. Sheriff Ray said ephedrine is a key ingredient to the manufacture of methamphetamine.

Sheriff Ray discussed some of the items found in the bags in the room with the Defendant. He explained that Coke bottles or gas cans with tubing were called "generators." Further, the cold packs could be split open and the contents placed into plastic bags to speed up the cooking process. He noted that the Coleman fuel could have provided the necessary heat source, and the Pyrex dishes were also a common tool used in the manufacture of

methamphetamine. The Sheriff testified that those manufacturing meth often wore gloves to avoid burns from the heat and the chemicals used in the process.

Sheriff Ray testified that the final stage of the manufacturing methamphetamine process was turning the liquid created into a powder form of methamphetamine. He said that, during this stage, the pseudoephedrine was contained in the liquid and there would be no pseudoephedrine pills lying around. The Sheriff noted that one method of conducting this final stage involved using a "generator" similar to the one depicted in the photographs taken of the items in the Defendants' possession.

During cross-examination, Sheriff Ray testified that he neither had a degree in chemistry or was an expert in the field of chemistry. He said he never went to the scene of this case but, instead, had only seen pictures taken at the scene. He agreed that many of the items pictured had a use other than for the production of methamphetamine.. The Sheriff conceded that the liquid found in this case had not been tested to verify it contained methamphetamine.

During redirect examination, the Sheriff testified that the manufacture of meth creates an odorless, dangerous gas called phosphane gas. This gas when inhaled can be deadly. He said that if one of his officers made a safety determination that it was too dangerous to test liquid because of the ventilation of the room containing the meth, or for any other reason, he would support that decision.

Based upon this evidence, the jury found both Defendants guilty of initiation of a process intended to result in the manufacture of methamphetamine and reckless endangerment. The trial court later granted the Defendants' motions for new trial on the conviction for reckless endangerment.

### C. Sentencing

The trial court held separate sentencing hearings for Defendant Bustamonte and Defendant Carroll.

### 1. Defendant Bustamonte

At Defendant Bustamonte's sentencing hearing, the following evidence was presented: The parties agreed that Defendant Bustamonte was a Range I, standard offender and that his applicable sentencing range was eight to twelve years. Jessie Rucker Paschal testified that she conducted the presentence investigation in this case for Defendant Bustamonte. She said that, on December 10, 2010, in Cannon County, Tennessee,

Defendant Bustamonte had been convicted of a process to manufacture meth and evading arrest. He was sentenced to six years and eleven months and twenty-nine days, respectively, and the trial court ordered the sentences to run concurrently. The trial court granted Defendant Bustamonte judicial diversion, and the Community Corrections program supervised Defendant Bustamonte during the diversion period. On January 23, 2011, Defendant Bustamonte was arrested in this case. Paschal said that, on June 10, 2011, Defendant Bustamonte's judicial diversion sentence was revoked and he was ordered to serve the remainder of his sentence.

Paschel testified also that, while the Defendant was in jail on the charges in this current case, he was charged with assault. He had not yet been to court on that charge.

Paschel testified that the Defendant reported no psychological issues, and he had achieved the eleventh grade in high school.

Based upon this evidence, the trial court found the following enhancement factors applicable: (1) the defendant had a previous history of criminal convictions other than those necessary to establish his sentencing range; (8) the defendant before trial or sentencing has failed to comply with the conditions of a sentence involving release into the community; and (13) at the time of the felony the defendant was on Community Corrections. T.C.A. § 40-35-114 (1), (8), and (13) (2012). The trial court found one mitigating factor, (4) that the defendant played a minor role in the commission of the offense. T.C.A. § 40-35-113 (4) (2012). The trial court then set Defendant Bustamonte's sentence at eleven years.

### 2. Defendant Carroll

At Defendant Carroll's sentencing hearing, the State contended that Defendant Carroll qualified as a Career Offender based upon his prior criminal record. The State noted that Defendant Carroll had committed four aggravated robberies, one on October 25, 2001, one on October 26, 2001, and two on October 28, 2001. The trial court noted that Defendant Carroll had been convicted of a Class B felony and that his applicable range of punishment was between eight and thirty years, depending on his offender classification.

Jessie Rucker Paschal testified that she also prepared the presentence report in Defendant Carroll's case. She offered her report, along with certified copies of Defendant Carroll's prior convictions. Paschal testified that her report indicated that Defendant Carroll had several prior convictions, including: one attempted aggravated robbery conviction from October 28, 2001; four aggravated robbery convictions, from October 25, 2001, October 26, 2001, and October 28, 2001; and one passing a worthless check conviction from November 1, 2001. All of these offenses, she said, were different counts included in one indictment

against Defendant Carroll. Paschal testified that Defendant Carroll was sentenced for these offenses on June 17, 2002, and his sentence appeared to be an effective sentence of ten years. Paschal testified that notes from the Defendant's prison file indicated that he was part of a "prison gang."

During cross-examination, Paschal testified that all of the aggravated robbery convictions were part of the same indictment, and all of the offenses occurred within a few days.

Based upon this evidence, the trial court determined that Defendant Carroll qualified as a Career Offender, having previously been convicted of four felonies. The trial court then sentenced the Defendant to serve thirty years, to be served at sixty percent.

## II. Analysis

On appeal, Defendant Carroll contends that the trial court erred when it denied his motion to suppress the evidence found during the search of the residence located at 200 Loop Circle, in DeKalb County, Tennessee. Additionally, both Defendants assert that: (1) the trial court erred when it allowed the State to amend the indictment to change the date of the offense; (2) the evidence is insufficient to sustain the convictions for initiation of a process intended to result in the manufacture of methamphetamine; (3) the trial court erred when it failed to instruct the jury on the charges of manufacture of methamphetamine, promotion of methamphetamine, and unlawful drug paraphernalia; (4) the trial court erred when it admitted into evidence the State's inventory list of the ingredients found during a search of the residence and photographs taken during the search; and (5) the trial court erred when it sentenced them.

### A. Motion to Suppress

Defendant Carroll contends that the trial court erred when it denied his motion to suppress evidence seized as a result of a search of the residence at Loop Circle. Defendant Carroll argues that, as a guest in the home, he had a legitimate expectation of privacy in the residence. Further, he asserts that Wilkey's mother, not Wilkey, was the lessee of the property. He argues that, because the actual lessor, Wilkey's mother, never gave consent for the search and Wilkey did not have the authority to give permission for the search, the trial court should have granted the motion to suppress. The State counters that Defendant Carroll has no standing to challenge the search because he did not own or reside in the residence. In the alternative, the State argues that, even if Defendant Carroll has standing, Wilkey gave a valid consent to the search.

When it denied Defendant Carroll's motion to suppress, the trial court found that consent may properly be given by a person living in the home and that consent was given by Wilkey. The trial court further found that Defendant Carroll did not have a possessory interest in the home and that Defendant Carroll had allowed officers to enter into the room where he was at the time of the search.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. *See State v. Walker*, 12 S.W.3d 460, 467 (Tenn. 2000). Our supreme court has said, "It is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent." *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), and *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). Generally, consent may be given "either by the individual whose property is searched or by a third party who possesses common authority over the premises." *State v. Ellis*, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000) (citations omitted). Common authority is the "mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). The State may also establish common authority "by demonstrating that the facts available to the searching police officers would have warranted 'a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Ellis*, 89 S.W.3d at 593 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990)).

"The sufficiency of consent depends largely upon the facts and circumstances in a particular case." *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. 2003). The prosecution bears

the burden of proving valid consent. *See State v. McMahan*, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). Furthermore, "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'" *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting *McMahan*, 650 S.W.2d at 386).

In the case under submission, we conclude that the evidence does not preponderate against the trial court's finding that Wilkey provided consent to search. Whether or not Wilkey was the listed lessee of the property, there is no dispute that it was where he resided with his two daughters, one of whom was married to Defendant Carroll. The testimony provided that his mother was the listed tenant on the lease agreement, but that arrangements had been made for Wilkey to renew the lease in his own name shortly after this incident occurred. Defendant Carroll occasionally stayed at the home, but he kept no clothing at the residence. Wilkey contacted law enforcement and expressed his belief that Defendant Carroll was manufacturing methamphetamine in the home. Law enforcement officers then met him at the home, where Wilkey gave them consent to search the residence and pointed out to them the room in which Defendant Carroll was located. The officers knocked on the door, and Defendant Carroll stepped back in a manner indicating that the officers could enter, saying "It's all mine." We conclude that Wilkey, if not the owner of the premises for consent purposes, at least possessed common authority over the premises, which imbued him with the authority to provide valid consent. As such, the trial court did not err when it denied Defendant Carroll's motion to suppress the evidence obtained as a result of the search. Defendant Carroll is not entitled to relief as to this issue.

### B. Amending Indictment

On the day that the Defendants' trial was set to begin, the State filed a motion to amend the indictments to reflect the correct date of the offense, January 23, 2011, rather than the listed January 25, 2011. The trial court granted the motion to amend. The Defendants moved to dismiss the indictments, and the trial court denied their request. On appeal, Defendant Carroll contends that his attorney prepared a defense based upon the January 25 date and was not prepared to defend a charge that occurred on January 23. Defendant Bustamonte contends that the trial court erred when it did not dismiss the indictments after the State amended them. The State counters first that the Defendants waived this issue by failing to cite to any authority and second that the trial court acted within its discretion when it allowed the State to amend the indictment.[4]

---

[4] Defendant Bustamonte filed a "Substituted Brief" in which he cites to legal authority for this argument. We accept his substituted brief, and we therefore conclude the issue is not waived.

An accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. *State v. Lindsey*, 208 S.W.3d 432, 437-38 (Tenn. Crim. App. 2006) (citing U.S. Const. amend. 6, 14; Tenn. Const. art. I, § 9; *see Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000)). Our courts have interpreted this constitutional mandate to require an indictment to "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." *Lindsey*, 208 S.W.2d at 438 (citing *Wyatt*, 24 S.W.3d at 324). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." *Id.* (citing T.C.A. § 40-13-202). An indictment need not conform to strict pleading requirements. *State v. Hill*, 954 S.W .2d 725, 727 (Tenn. 1997).

The Tennessee Rules of Criminal Procedure provide for an indictment to be amended. Tennessee Rule of Criminal Procedure 7(b) provides:

(b) Amending Indictments, Presentments and Informations.

(1) With Defendant's Consent. With the defendant's consent, the court may amend an indictment, presentment, or information.

(2) Without Defendant's Consent. Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced.

The date in the indictment may be amended pursuant to Tennessee Rule of Criminal Procedure 7(b). *See State v. Kennedy*, 10 S.W.3d 280, 283 (Tenn. Crim. App. 1999) (citing *State v. Marlow*, 665 S.W.2d 410, 413 (Tenn. Crim. App. 1983) (holding that the defendant was not prejudiced by the state's ability to impeach a witness with her prior inconsistent statement under the amended date); *State v. Sexton*, 656 S.W.2d 898, 900 (Tenn. Crim. App. 1983) (holding that the charged offense qualified for Class X classification under either the original or the amended date); and *State v. Harrington*, 627 S.W.2d 345, 346 (Tenn. 1981) (holding that an amendment correcting the date on which the witnesses were sworn did not prejudice the defendant)). This Court has held that the amendment of the date in an indictment does not charge the defendant with a new or an additional crime. *Id.*

In the case presently before us, we conclude that the trial court did not err when it allowed the State to amend the indictment to reflect the proper date, which was two days

before the date reflected on the indictments. We first note that, pursuant to Tennessee law, "[t]he time at which the offense was committed need not be stated in the indictment, but the offense may be alleged to have been committed on any day before the finding thereof, or generally before the finding of the indictment, unless the time is a material ingredient in the offense." T.C.A. § 40-13-207 (2012). Further, time is not a "material ingredient" to the offense of the initiation of a process intended to result in methamphetamine. *See* T.C.A. § 39-17-435 (2010). Because time is not a material element of the offenses for which the Defendants were charged, we conclude that the trial court properly permitted the State to amend the date in the indictment. The Defendants are not entitled to relief on this issue.

## C. Sufficiency of the Evidence

Defendant Carroll contends that the evidence is insufficient to sustain his conviction because there were no pills or pill packs found, a necessary component to manufacturing methamphetamine, and because law enforcement officers did not test the liquid found at the residence. Further, he asserts, there was no methamphetamine found at the scene. Therefore, Defendant Carroll contends, the State failed to prove its case. Defendant Bustamonte similarly contends that the State failed to prove that the liquid found contained ephedrine, the precursor to methamphetamine. The State counters that the evidence establishes the elements of the offense beyond a reasonable doubt.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Tennessee Code Annotated section 39-17-435 provides the elements of the offense of initiation of a process intended to result in the manufacture of methamphetamine:

> (a) It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine.

> (b) It shall not be a defense to a violation of this section that the chemical reaction is not complete, that no methamphetamine was actually created, or that the process would not actually create methamphetamine if completed.

(c) For purposes of this section, "initiates" means to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation.

Viewing the evidence in the light most favorable to the State, the jury had before it sufficient evidence by which to find both Defendants guilty. Wilkey, the homeowner, testified that he suspected that the Defendants were in the room manufacturing methamphetamine, and he contacted police. Detective Taylor testified that, when he arrived and knocked on the door wherein the Defendants were located, Defendant Carroll stepped back and said, "It's all mine." When he entered, he saw three men in the room, including Defendant Carroll and Defendant Bustamonte, all of whom were wearing gloves. Located in the room/bathroom area were two Coleman burners, upon each of which was located a Pyrex dish containing a liquid. In the room, Detective Taylor found multiple items associated with the manufacture of methamphetamine, including a twenty-ounce soda bottle with a hole drilled in the top and rubber tubing coming out of the hole. Also in the room were two backpacks in which multiple items necessary for the manufacture of methamphetamine were found. Sheriff Ray testified about the items found in the backpacks and their use in the manufacturing process and also that it appeared that the manufacturing process in this case was in its "final stages." We conclude that, based upon this evidence, a reasonable trier of fact could have found both Defendants guilty of initiating a process to manufacture methamphetamine. The Defendants are not entitled to relief on this issue.

### D. Instructions on Lesser-Included Offenses

Defendant Bustamonte next contends that the trial court erred when it denied their motion to instruct the jury on the manufacture of methamphetamine, promotion of methamphetamine, and unlawful drug paraphernalia. Defendant Bustamonte contends that the "current lesser-included offense test [articulated in *Burns*] is much too limited." Therefore, while the offenses he requested in his motion may not be lesser-included offenses pursuant to *Burns*, Defendant Bustamonte argues that the trial court still should have instructed the jury on them. Defendant Carroll agrees that, since the evidence presented by the State could have supported a conviction for the aforementioned offenses, the trial court erred when it failed to instruct the jury on those offenses. The State counters that the Defendants failed to provide an adequate record for appellate review and have thereby waived the issue. The State further contends that, even if not waived, the issue lacks merit because none of the offenses proposed by the Defendants are lesser-included offenses of the charged offense.

As the State points out, the record originally did not contain the jury verdict forms. On January 3, 2013, Defendant Bustamonte filed a supplemental brief containing the jury verdict forms. Further, as the State notes, two pages of the trial court's oral ruling on the Defendants' motions for jury instructions is missing from the trial transcript. Contained in the record, however, are the trial court's instructions to the jury. We conclude that, the supplemental record and the trial court's instructions give us an adequate record for review.

The question of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). The standard of review for mixed questions of law and fact is de novo with no presumption of correctness. *Id.* The trial court has a duty "to give a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); *see* Tenn. R. Crim. P. 30.

A Defendant has a "right to have the jury instructed on all lesser-included offenses supported by the evidence." *State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006). In *State v. Burns*, our Supreme Court enunciated what constitutes a lesser-included offense:

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

      (1) a different mental state indicating a lesser kind of culpability; and/or

      (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

      (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

6 S.W.3d at 466-67. If an offense is a lesser-included offense under the *Burns* analysis, then the trial court must conduct the following two-step analysis in order to determine if the lesser-included offense instruction should be given:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

*Id.* at 469.

If a trial court improperly omitted a lesser-included offense instruction, then constitutional harmless error analysis applies. "An error affecting a constitutional right is presumed to be reversible, and any such error will result in reversal of the conviction unless the State proves beyond a reasonable doubt that the error did not affect the outcome of the trial." *State v. Ely*, 48 S.W.3d 710, 725 (Tenn. 2001) (citing *State v. Harris*, 989 S.W.2d 307, 315 (Tenn. 1999)). Our Supreme Court has instructed that "[i]n making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *State v. Allen*, 69 S.W.3d 181, 191 (Tenn. 2002).

As defined by the Legislature, "It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." T.C.A. § 39-17-435(a) (2010). The term "initiates" is defined to mean "to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substances that can be used in methamphetamine creation." T.C.A. § 39-17-435(c).

The Defendants requested three offense instructions as "lesser-included" to the charged offense: manufacture of methamphetamine, promotion of methamphetamine, and unlawful drug paraphernalia.

## 1. Manufacture a Controlled Substance

The Defendants requested an instruction on the manufacture of a controlled substance, here methamphetamine. The relevant offense is defined by statute as:

(a) It is an offense for a defendant to knowingly:

(1) Manufacture a controlled substance;

(2) Deliver a controlled substance;

(3) Sell a controlled substance; or

(4) Possess a controlled substance with intent to manufacture, deliver or sell the controlled substance.

T.C.A. § 39-17-417 (2010). The statute defining initiation of a process intended to result in methamphetamine states that "(e) A person may not be prosecuted for a violation of this section and of manufacturing a controlled substance in violation of § 39-17-417 based upon the same set of facts." T.C.A. § 39-17-435.

We conclude the trial court did not err when it did not instruct the jury on the offense of manufacturing a controlled substance. First, this offense is not a lesser included offense under the *Burns* analysis. Second, the Legislature has statutorily instructed that a defendant may not be prosecuted for both offenses for the same conduct. Accordingly, the trial court did not err when it denied the Defendants' request to offer the jury this instruction.

## 2. Promotion of Methamphetamine

The Defendants next requested that the jury be instructed on the offense of promotion of methamphetamine. This offense is defined as:

(a) It is an offense for a person to promote methamphetamine manufacture. A person promotes methamphetamine manufacture who:

(1) Sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use;

(2) Purchases or possesses more than nine (9) grams of an immediate methamphetamine precursor with the intent to manufacture methamphetamine or deliver the precursor to another person whom they know intends to manufacture methamphetamine, or with reckless disregard of the person's intent; or

(3) Permits a person to use any structure or real property that the defendant owns or has control of, knowing that the person intends to use the structure to manufacture methamphetamine, or with reckless disregard of the person's intent.

(b) Expert testimony of a qualified law enforcement officer shall be admissible to establish that a particular chemical, drug, ingredient, or apparatus can be used to produce methamphetamine. For purposes of this testimony, a rebuttable presumption is created that any commercially sold product contains or contained the product that it is represented to contain on its packaging or labels.

(c) Possession of more than fifteen (15) grams of an immediate methamphetamine precursor shall be prima facie evidence of intent to violate this section.

T.C.A. § 39-17-433 (2010).

We conclude that this offense is not a lesser-included offense of initiation of a process intended to result in methamphetamine. This offense criminalizes the conduct of a person who "sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine." This crime requires an element or elements different from "knowingly initiat[ing] a process intended to result in the manufacture of any amount of methamphetamine." *See* T.C.A. § 39-17-435(a). Because the two offenses contain different elements, one is not a lesser-included offense of the other. *See Burns*, 6 S.W.3d at 466-67.

Further, even if a lesser-included offense, the evidence did not warrant such a jury instruction. There was no evidence that the Defendants sold, purchased, acquired, or

delivered a chemical drug or apparatus. The evidence, instead, proved that law enforcement officers found the Defendants in a house during the process of manufacturing methamphetamine. Accordingly, this jury instruction was not warranted under the facts of this case.

### 3. Unlawful Drug Paraphernalia

Finally, the Defendants requested a jury instruction on the offense of possession of unlawful drug paraphernalia. The statute criminalizing possession of drug paraphernalia reads that, except when for statutorily enumerated purposes, it is unlawful:

> (a)(1) . . . for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue in violation of this part.

T.C.A. § 39-17-425 (a)(1) (2010). Section (b)(1) of this part makes it an offense to "deliver" or "possess[] with intent to deliver, or manufacture[] with intent to deliver" drug paraphernalia, "knowing . . . that it will be used to . . . manufacture . . . or otherwise introduce into the human body a controlled substance . . . ."

We conclude that this offense is not a lesser-included offense of initiation of a process intended to result in methamphetamine. In order to obtain a conviction under this code section, the State must prove beyond a reasonable doubt: (1) that the defendant possessed an object; (2) that the object possessed was classifiable as drug paraphernalia; and (3) that the defendant intended to use that object for at least one of the illicit purposes enumerated in T.C.A. § 39-17-425. *State v. Mallard*, 40 S.W.3d 473, 486 (Tenn. 2001). This offense contains elements different from those necessary to prove that a defendant "knowingly initiated a process intended to result in the manufacture of any amount of methamphetamine." *See* T.C.A. § 39-17-435(a). Because the two offenses contain different elements, one is not a lesser-included offense of the other. *See Burns*, 6 S.W.3d at 466-67. The Defendants' are not entitled to relief as to this issue.

### E. Inventory List and Photograph

The Defendants next contend that the trial court erred when it denied the motion in limine to exclude an inventory list of items found at the residence as well as photographs of the items listed in the inventory list. The Defendants claim that the trial court should have

excluded the list and photographs as cumulative evidence. Defendant Carroll also contests one of the photographs based upon its content. He contends that the picture depicted the two backpacks law enforcement officers found. He states that the officers moved the backpacks from the room where they were found to the carport before photographing them. As such, he avers that the picture was not an accurate representation of how and where the items were originally found.

Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion. *See State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn.1997)). A trial court's exercise of discretion will not be reversed on appeal unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). When determining admissibility, a trial court must first decide if the evidence is relevant. Tenn. R. Evid. 402 ("All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."); *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant evidence. Tenn. R. Evid. 401. After a court concludes evidence is relevant, the court must then weigh the probative value of the evidence against the danger the evidence will unfairly prejudice the defendant at trial. Relevant evidence should be excluded if the court determines that the probative value of the evidence "is substantially outweighed by its danger of unfair prejudice." Tenn. R. Evid. 403. The Tennessee Supreme Court has previously emphasized:

> Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.

*James*, 81 S.W.3d at 757-58 (internal quotations and citations omitted).

Applying these principles, we conclude that the trial court did not abuse its discretion by allowing the State to offer the inventory list of items found during the search or the six photographs depicting those items. The offense for which the Defendants were charged was initiating a process intended to result in methamphetamine. The items inventoried were common household items, some of which were modified, that officers testified were

commonly used in the manufacture of methamphetamine. We have reviewed the photographs and most of the items are shown in only one photograph, with only a few items being shown in multiple photographs. We conclude the trial court did not err when it determined that this evidence was not cumulative and was not unfairly prejudicial. The Defendants are not entitled to relief on this issue.

### F. Sentencing

Defendant Carroll contests the trial court's sentencing him as a Career Offender. He first contends that: (1) the trial court erred when it granted the State a continuance to allow time to file a notice to seek enhanced punishment and further that, because the notice was improperly filed, the trial court erred when it did not sentence him as a Range I offender; and (2) the trial court erred when it denied his motion in limine to try him as a Range I offender because the State failed to file its notice to seek enhanced punishment in a timely manner. Because both of these issues stem from Defendant Carroll's contention that he was sentenced in an improper range, we will address them herein. Defendant Bustamonte contends that the trial court erred when it sentenced him by not giving any or enough weight to a mitigating factor and by using his reckless endangerment conviction as a reason for not mitigating his sentence.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court

reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Christine Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case.'" *Susan Renee Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007)). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51.

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

## A. Defendant Carroll - Sentencing Range

Defendant Carroll contests the trial court's sentencing him as a Career Offender. He first contends that: (1) the trial court erred when it granted the State a continuance in order to file a notice to seek enhanced punishment and further that, because the notice was improperly filed, the trial court erred when it did not sentence him as a Range I offender; and (2) the trial court erred when it denied his motion in limine to try him as a Range I offender because the State failed to file its notice to seek enhanced punishment in a timely manner.

The Defendants' trial was originally set for August 8, 2011. On August 5, 2011, the State filed a "Notice of Enhanced Punishment," asking that the trial court sentence Defendant Carroll as a Career Offender. The applicable rule, discussed below, requires that the State give ten days notice. The State's attorney told the trial court that he had spoken with Defendant Carroll's attorney and that the two realized that Defendant Carroll's motion to suppress had not yet been heard. The State's attorney said that the two contemplated that the trial date would be better utilized as a motion hearing date. Defendant Carroll's attorney agreed this was an accurate account of their conversation, stating, "That was the conversation on Friday, yes, sir." The trial court then heard and denied the motion to suppress.

After the trial court's denial of the motion to suppress, Defendant Carroll's attorney said that Defendant Carroll opposed the State's motion for a continuance, citing several reasons. Defendant Carroll moved for a speedy trial. The State countered that this case was indicated in April 2011 and that August 8, 2011, was the first court date. The State asserted that there was no lengthy delay. Further, the State contended that Defendant Carroll's only remedy would be a motion to continue the case, which was what the State was seeking. After hearing the parties' arguments, the trial court continued the case to August 19, 2011, to provide a trial date more than ten days after the filing of the notice.

The granting of a continuance lies within the sound discretion of the trial court, and we will not reverse that decision absent a showing of an abuse of discretion. *State v. Schmeiderer*, 319 S.W.3d 607, 617 (Tenn. 2010) (citing *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)). "'An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" *Id.* (quoting *State v. Hines*, 919 S.W.2d 573, 579 (Tenn.1995)).

Tennessee Rule of Criminal Procedure 12.3 states:

(a) Noncapital Cases. If the district attorney general intends to seek an enhanced punishment as a multiple, persistent, or career offender, the district attorney general shall file notice of this intention not less than ten (10) days

before trial. If the notice is untimely, the trial judge shall grant the defendant, on motion, a reasonable continuance of the trial.

If the defendant does not request a continuance, the written notice shall be valid. Tenn. R. Crim. P. 12.3 *advisory commission cmts*.

Our Legislature has also addressed this issue in Tennessee Code Annotated section 40-35-202(a) (2012). That code section provides:

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that the notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement . . . must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions. The original or certified copy of the court record of any prior felony conviction, bearing the same name as that by which the defendant is charged in the primary offense, is prima facie evidence that the defendant named therein is the same as the defendant before the court, and is prima facie evidence of the facts set out therein.

In other words, the statute requires at a minimum that the State file "(1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, (3) setting forth the nature of the prior felony conviction, the dates of the convictions, and the identity of the courts of the convictions." *State v. Livingston*, 197 S.W.3d 710, 713-14 (Tenn. 2006). The purpose of the statutory notice requirement is to provide a defendant with fair notice that he or she is subject to greater than the standard sentencing range, to facilitate plea agreements, to enable the defendant to make an informed plea, and to aid trial strategy. *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990); *State v. Taylor*, 63 S.W.3d 400, 412 (Tenn. Crim. App. 2001). Our Supreme Court has held that "perfect" notice is not required, but fair notice must be provided. *Livingston*, 197 S.W.3d at 713. This means that "when the State has substantially complied with Section 40-35-202(a), an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." *Taylor*, 63 S.W.3d at 412; *see also State v. Cooper*, 321 S.W.3d 501, 507 (Tenn. 2010).

The record indicates that the parties engaged in plea negotiations before the trial in this case, beginning in July 2011. Those negotiations were all made with the assumption that the pretense that Defendant Carroll qualified as a Career Offender. Defendant Carroll's

attorney conceded that she had notice that the State sought to prosecute Defendant Carroll as a Career Offender, but she asserted that, regardless, the State had not followed the rule by filing the notice ten days before the scheduled trial date.

We conclude Defendant Carroll is not entitled to the relief he seeks. First, he had actual notice that the State sought to prosecute him as a Career Offender. He cannot, therefore, show that he was prejudiced by the State's late filing of the notice. Second, the trial court granted him the relief to which he would be entitled under the rule by granting a continuance.

As a secondary argument, Defendant Carroll contends that the trial court erred when it denied his motion in limine to try him as a Range I offender because the State failed to file its notice to seek enhanced punishment in a timely manner. Because we have concluded that the State did file a timely notice to seek enhanced punishment, more than ten days before the August 19, 2011 trial date, we conclude that this issue is without merit.

### B. Defendant Bustamonte - Mitigating Factors

Defendant Bustamonte contends that the trial court erred when it failed to give any or enough weight to the mitigating factor that, because of his youth, he lacked substantial judgment in committing the offense. He further contends that the trial court erred by using his reckless endangerment conviction, a conviction for which he was later granted a new trial, as a reason for not mitigating his sentence. He states that the trial court refused to consider the mitigating factor that his conduct neither caused nor threatened serious bodily injury, stating he had been convicted of reckless endangerment. The State counters that the record supports the trial court's ruling. We agree with the State.

At the conclusion of the sentencing hearing, the trial court found Defendant Bustamonte was a Range I, standard offender, with an applicable sentencing range of eight to twelve years. The trial court found the following enhancement factors applicable: (1) the defendant had a previous history of criminal convictions other than those necessary to establish his sentencing range; (8) the defendant before trial or sentencing has failed to comply with the conditions of a sentence involving release into the community; and (13) at the time of the felony the defendant was on Community Corrections. T.C.A. § 40-35-114 (1), (8), and (13). The trial court found one mitigating factor, (4) that the defendant played a minor role in the commission of the offense. T.C.A. § 40-35-113 (4) (2012). The trial court rejected the other mitigating factors offered by Defendant Bustamonte, and set the sentence at eleven years.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2010).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d 699 n.33, 704; *Carter*, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

We conclude that the Defendant's sentence of eleven years does not wholly depart from the 1989 Sentencing Act. Further, the trial court imposed the sentence in a manner consistent with the purposes set out in the Act. We are, therefore, bound by its decision as to the length of the sentence. Defendant Bustamonte is not entitled to relief on this issue.

### III. Conclusion

Based upon the foregoing authorities and reasoning, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE